DAVID A. DIEPENBROCK (SBN 215679)
**weintraub tobin** chediak coleman grodin
LAW CORPORATION
400 Capitol Mall, 11th Floor
Sacramento, California 95814
Telephone:    916.558.6000
Facsimile:    916.446.1611
Email: ddiepenbrock@weintraub.com

Attorneys for Plaintiff,
CHERYL BLY-CHESTER

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERYL BLY-CHESTER, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>EL DORADO COUNTY, a California government entity; TOM BURNETT, an individual; KAREN GARNER, an individual; EVAN MATTES, an individual; AARON MOUNT, an individual; and KATHY WITHEROW. an individual,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATION OF THE CIVIL RIGHTS ACT OF 1871, 42 U.S.C. § 1983, AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12132, AND THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, CAL. GOV. CODE 42 § 12900**<br><br>**DEMAND FOR JURY TRIAL** |

{4358951.DOCX:7}

COMPLAINT

**THE PARTIES**

1.    Plaintiff Cheryl Bly-Chester ("Dr. Bly-Chester") is an individual whose primary residence is located in El Dorado County.

2.    Defendant El Dorado County is, and at all times relevant herein has been, a unit of local government, duly formed and authorized under the laws of the State of California.

3.    Defendant Tom Burnett is, and at all times relevant herein has been, a public officer employed by El Dorado County, as the Deputy Director of Building, with primary building permitting authority in El Dorado County. Burnett is being sued in his individual capacity for, among other things, creating, authoring, and/or carrying out written and unwritten practices and policies, that when adopted and employed, have denied Plaintiff of her Civil Rights.

4.    Defendant Karen Garner is, and at all times relevant herein has been, a public officer employed by El Dorado County, as the Director of its Planning and Building Department.  Garner is being sued in her individual capacity for, among other things, creating, authoring, and/or carrying out written and unwritten practices and policies, that when adopted and employed, have denied Plaintiff of her Civil Rights.

5.    Defendant Evan Mattes is, and at all times relevant herein has been, employed by El Dorado County, within its Planning and Building Department, as a Planner, Mattes is being sued in his individual capacity for, among other things, by creating, authoring, and/or carrying out written and unwritten practices and policies, that when adopted and employed, have denied Plaintiff of her Civil Rights.

6.    Defendant Aaron Mount is, and at all times relevant herein has been, a public officer employed by El Dorado County, within its Planning and Building Department, as a Planning Manager.  Mount is being sued in his individual capacity for, among other things, creating, authoring, and/or carrying out written and unwritten practices and policies, that when adopted and employed, have denied Plaintiff of her Civil Rights.

7.    Defendant Kathy Witherow is, and at all times relevant herein has been, employed by El Dorado County, within its Planning and Building Department, as the Executive Assistant to the Director of Planning and Building. Witherow is being sued in her individual capacity for, among

other things, creating, authoring, and/or carrying out written and unwritten practices and policies, that when adopted and employed, have denied Plaintiff of her Civil Rights.

8. Defendants Tom Burnett, Karen Garner, Evan Mattes, Aaron Mount, and Kathy Witherow are sometimes collectively referred to below as the "Individual Defendants."

### JURISDICTION AND VENUE

9. This action is based upon, and seeks to redress violations of, the Civil Rights Act of 1871, 42 U.S.C. § 1983; The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101; The First Amendment to the United States Constitution; the Fifth Amendment to the United States Constitution; the Fourteenth Amendment to the United States Constitution; and the California Fair Employment and Housing Act, Cal. Gov. Code 42 § 12900 et seq., caused by Defendants acting under color of law. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, in that this action arises under the Constitution and laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state law claims.

10. Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. The conduct complained of herein occurred within this District, and the property at issue in this action is likewise located in this District. El Dorado County is located within this District, and all of the defendants are residents of the State of California.

### FACTUAL ALLEGATIONS

#### A. Dr. Bly-Chester's Professional Background

11. Dr. Bly-Chester is a highly accomplished civil and environmental engineer. She holds a Bachelor's Degree in Civil Engineering, a double Master's Degree as an MBA and Masters in International Management, a Doctorate in Management and Organizational Leadership and a graduate certification from M.I.T. in Nuclear Power Safety Systems. She served as the Program Manager for two multi-million-dollar Department of Defense Operations and Maintenance (O&M) Contracts (McClellan AFB at $150 Million and Sharp/Tracy Army Depot at $48 Million), which included managing five wastewater treatment plants and a nuclear reactor.

/ / /

**weintraub tobin** chediak coleman grodin
law corporation

12. Among other accomplishments, Dr. Bly-Chester is a California Licensed Professional Engineer, a certified State Water Resources Board Qualified Stormwater Designer, Practitioner, and Industrial Practitioner (QSD/QSP/QSIP), Life Member and Fellow of the Society of American Military Engineers and Past Sacramento Post President, a Registered Environmental Property Assessor, a Certified Environmental and Safety Compliance Officer; a Certified Waste Management Professional, a Certified Risk Assessment and Management Professional, a Certified Natural Resources Professional, and a Certified Sustainability and Resilience Professional.

13. Dr. Bly-Chester has authored hundreds of engineering and environmental reports and several peer-reviewed publications, including the inaugural Environmental Chapter of the McGraw Hill reference manual *Highway Engineering Handbook* and a Chapter on the Stakeholder Analysis of Critical Interconnected Infrastructure in the Sacramento River Delta as part of a NIS research grant through U.C. Berkeley Center for Catastrophic Risk Management.

14. Among other boards and commissions, she received a gubernatorial appointment and served as the Vice President of the California Reclamation Board (now the Central Valley Flood Protection Board) and Lead Board Member for Permits, the Board Representative for the Interagency Collaborative Forum for Emergency Levee Repair and the Delta Levee Subventions Committee Chair. She was also a gubernatorial appointee as the Vice Chair of the State Mining and Geology Board and Chair of the Geohazards Committee, member of the Mining Standards Committee, and a member of the Special Subcommittee coordinating with the California Central Valley Flood Protection Board.

**B.** **Dr. Bly-Chester Became Disabled and Decided to Build an Accessible Home**

15. In 2016, Dr. Bly-Chester became disabled with a spinal impairment that limits her mobility and balance. As a consequence of this disability, she wears a back-brace for support and walks with a cane for balance There are times when Dr. Bly-Chester suffers acute episodes that result in her being bedbound for days at a time. Dr. Bly-Chester's disability is expected to get worse such that she anticipates that she eventually will be confined permanently to a wheelchair.

16. In 2017, Dr. Bly-Chester purchased a 3-bedroom home on a 4-acre parcel of land located in the Somerset Area of El Dorado County ("Subject Property"). After purchasing the Subject

**weintraub tobin** chediak coleman grodin
law corporation

Property, Dr. Bly-Chester developed a plan to build an ADA-compliant accessory dwelling unit ("ADU") with specific requirements, including no steps to the living space, gurney and wheelchair access into all living spaces, wheelchair accessible bathrooms, a lift into a three-season porch, and a sheltered deck to enjoy the outdoors from a walker or wheelchair during her eventual retirement, while still hosting outdoor gatherings for her children and grandchildren.

### C.   Overview of California's ADU Law

17.   In 2019, with Assembly Bill No. 68, the California Legislature enacted legislation to promote the construction of more accessory dwelling units ("ADU Law"). 2019 Cal ALS 655, 2018 Cal AB 68, 2019 Cal Stats. ch. 655. The ADU Law directed that permit applications for accessory dwelling units be approved ministerially without discretionary review or a hearing.  Assembly Bill No. 68 was signed into law by the Governor on October 9, 2019 and filed the same day to amend Sections 65852.2 and 65852.22 of the California Government Code, effective January 1, 2020. *Id*.

18.   The Legislative Counsel's Digest explained the intent of the AB 68 amendment was to shorten the ministerial review of permit applications for accessory dwelling units from the 120 days in existing law to only 60 days, as follows:

> Existing law requires a local agency to ministerially approve or deny a permit application for the creation of an accessory dwelling unit or a junior accessory dwelling unit within 120 days of receiving the application: This bill would instead require a local agency to **ministerially approve or deny** a permit application for the creation of an accessory dwelling unit or junior accessory dwelling unit **within 60 days** from the date the local agency receives a completed application if there is an existing single-family or multifamily dwelling on the lot, and would authorize the permitting agency to delay acting on the permit application if the permit application is submitted with a permit application to create a new single-family or multifamily dwelling on the lot, as specified.

*Id*.  AB 68 amended section 65852.2 of the Government Code to provide for this 60-day review period. *Id*. The Legislature amended this Code section several times, but without changing the 60-day ministerial approval period.  See, e.g., 2021 Cal ALS 343, 2021 Cal AB 345, 2021 Cal Stats. ch. 343 (effective January 1, 2022); 2022 Cal ALS 650 2022 Cal AB 2221, 2022 Cal Stats. ch. 650 (effective January 1, 2023); 2023 Cal ALS 751, 2023 Cal AB 976, 2023 Cal Stats. ch. 751 (effective January 1, 2024). The Legislature repealed 65852.2 of the Government Code, effective March 25,

2024. *See* 2024 Cal ALS 7, 2024 Cal SB 477, 2024 Cal Stats. ch. 7. The Legislature enacted Section 66317 of the California Government Code, effective March 25, 2024, to provide in pertinent part as follows:

> A permit application for an accessory dwelling unit or a junior accessory dwelling unit shall be considered and approved **ministerially without discretionary review** or a hearing, notwithstanding Section 65901 or 65906 or any local ordinance regulating the issuance of variances or special use permits. The permitting agency shall either approve or deny the application to create or serve an accessory dwelling unit or a junior accessory dwelling unit **within 60 days** from the date the permitting agency receives a completed application if there is an existing single-family or multifamily dwelling on the lot. … If the applicant requests a delay, the 60-day time period shall be tolled for the period of the delay. If the local agency has not approved or denied the completed application within 60 days, the application shall be deemed approved.

Cal. Gov't Code § 66317(a) (2024) (emphasis added). Accordingly, at all times relevant herein, the California legislature has consistently directed, since January 1, 2020, that review and approval of ADU applications must be completed on a ministerial basis within 60 days.

19.    During times relevant herein, the Legislature further directed that the ministerial review and approval of ADU permit applications be performed using "**objective standards**," which the Legislature defined as follows: "standards that involve **no personal or subjective judgment** by a public official and are uniformly verifiable by reference to an external and uniform benchmark or criterion available and **knowable by both the development applicant or proponent and the public official prior to submittal**." Former Cal. Gov't Code § 65852.2(j)(7); 2023 Cal ALS 752, 2023 Cal AB 1033, 2023 Cal Stats. ch. 752 (adding definition, effective January 1, 2023); 2023 Cal ALS 752, 2023 Cal AB 1033, 2023 Cal Stats. ch. 752 (effective January 1, 2024).

20.    The Government Code currently provides that "[n]o local ordinance, policy, or regulation, other than an accessory dwelling unit ordinance consistent with this article shall be the basis for the delay or denial of a building permit or a use permit under this section." Cal. Gov't Code § 66317(c).

**D.    Dr. Bly-Chester's ADU Application Was Deemed Approved on July 18, 2022**

21.    Before she could apply for a building permit for her accessible ADU, Dr. Bly-Chester first needed to obtain a variance from the County Zoning Administrator to reduce required setbacks.

weintraub tobin chediak coleman grodin
law corporation

22.    Her request for a variance was heard in a Public Zoning Administrator Hearing and approved on March 17, 2021. The approval cleared the planning process and set the application for a permit entirely under the County Building Official for ministerial permit approval. The Zoning Administrator's findings of approval adopted the staff report recommendations in their entirety, as follows:

> **Zoning Ordinance Consistency:** With the exception of the requested Variance, the project is consistent with applicable provisions of the Zoning Ordinance including Table 130.24.030 (Residential Zone Development Standards), Section 130.30.050.D (Fire Safe Setbacks), Table 130.30.050.H.1 (Specific Riparian Setbacks), and Chapter 130.39 (Oak Resources Conservation). For details, please refer to the Findings section below.
>
> ….
>
> With the exception of a reduced side setback, the proposed ADU with attached wine/root cellar and 3,000-gallon water tank will comply with all other Zoning Ordinance development standards, including front and rear setbacks for the RE-5 Zone District (Table 130.24.030). Staff recommends approval of Variance V20-0003 as requested, as the required findings for a Variance can be made. With the exception of the requested Variance, the project is consistent with all applicable requirements of the Zoning Ordinance (Title 130 of the County Ordinance Code) and General Plan.

23.    On May 19, 2022, Dr. Bly-Chester applied in person, wearing a back brace and walking with a cane, for a building permit for an ADU with 1,587 square feet (under the maximum of 1,600 square feet), root cellar and water tank using the same survey and project plan sheet that was evaluated and approved by the Zoning Administrator. County staff processed the application, assigned it an application number, and then posted on the County's "eTrakit" system that the application was "complete." On June 10, 2022, despite the Zoning Administrator's findings and approvals, Planning Department employee Evan Mattes sent a letter stating: "The Planning Division has reviewed the application referenced above for compliance with the El Dorado County Zoning Codes and General Plan Policies."

24.    The review of the plans for consistency with the Zoning Ordinances and General Plan had already been determined in a public hearing by the Zoning Administrator, at significant expense to Dr. Bly-Chester. Mattes reviewing the permit application a second time, for planning clearance, after a Zoning Administrator Public Hearing approval, violated Dr. Bly-Chester's due process rights.

/ / /

It was also a discretionary review in violation of the Legislature's directive that review of ADU permit applications be limited to a ministerial review of the plans.

25.     Mattes stated that he believed the square footage of the proposed ADU exceeded 1,600 square feet (without stating any alternative measurement) and that the setback requirements were not met. He requested new plans or supplemental information and invited a response by email.

26.     On July 13, 2022, Dr. Bly-Chester responded by email with supplemental information indicating the Zoning Administration Hearing approval and stating that she designed the ADU to meet her disability needs, and that under the County's hitherto customary interpretation of the Building Code and County Ordinance and under a strict interpretation of the County definition of "habitable space," the submitted plans met the specified maximum square footage of 1,600 square feet.

27.     The County received the supplemental information on both setbacks and square-footage without comment or objection. The County verified the square footage as 1,587 square feet on July 12, 2022 and posted the verification on the County eTrakit website. The County took no action to approve or deny Dr. Bly-Chester's permit application within 60 days, so **the permit was deemed approved as a matter of law on July 18, 2022.**

28.     On July 19, 2022, the day after the 60-day action deadline passed, Dr. Bly-Chester held a construction kick-off meeting at the Subject Property. Her contractor started preparing the site that day, and her surveyor set construction gridlines a few days later, and having a PG&E power pole moved away from the construction site, which required paying for and obtaining a new address for the ADU issued by the County.

**E.     Defendants Refused to Recognize That the Permit Was Deemed Approved**

29.     On July 20, 2022, the Building Department purported to provide plan review comments on Dr. Bly-Chester's permit application, requesting no structural changes or comments on square footage, and only posing questions on minor issues such as driveway profiles, drainage, and a retaining wall design. Dr. Bly-Chester promptly responded, stating that the 60-day deadline had expired, that her permit was no longer subject to review, and that she wanted to pay her remaining review and inspection fees and move forward with construction. Dr. Bly-Chester subsequently mailed

two checks by certified mail to the Building Department – one addressed to the Building Department for review fees and one to the Office of Education for school fees.

30. Dr. Bly-Chester was subsequently met with a procedural blockade constructed by members of the County Planning Division, including defendant Karen Garner, its Director of the Planning and Building Department. First, Defendant Planning Manager Aaron Mount held a Planning Division meeting on August 10, 2022, whose attendees included Defendant Planner Evan Mattes, to discuss the action to be taken against Dr. Bly-Chester.  In his acceptance of the meeting invitation, defendant Mattis replied, "AUD [sic] that Owner believes to be approved. I know some of us have talk to them already, but a short meeting would be helpful Thanks"

31. Defendant Planning Manager Aaron Mount intercepted, held for several weeks and then returned Dr. Bly-Chester's fee checks with a letter posing several theories as to why the permit was not approved. Director Karen Garner subsequently took the position that Dr. Bly-Chester's proposed ADU exceeded 1,600 square feet, notwithstanding (a) the Building Division's verification of Dr. Bly-Chester's 1,587 square-foot calculation, and (b) the Planning Staff never presenting any alternative measurement or analysis or detail of an alternate measurement due to their complete lack of knowledge, training, or experience in making such calculations.

32. On September 2, 2022, in an email from County Supervisor Turnboo's Office to Defendant Mount, Defendant Garner, and others employed by the County, Dr. Bly-Chester's disability was made clear, by conveying the following on Dr. Bly-Chester's behalf

> I am partially disabled and have specific health needs. I designed an Accessory Dwelling Unit (granny flat) to meet my health needs and submitted the plans for the ADU on May 19, 2022 making the deadline to ministerially approve the plans by July 18, 2022.  Every day that I am delayed in being able to occupy that dwelling causes my health to suffer unnecessarily. Also, this ADU has fire department-approved features that will provide better protection for me and my property so I am anxious to get in it.

33. On September 6, 2022, Dr. Bly-Chester spoke with Defendant Planning Director Karen Garner on the phone about clearing the permit. Ms. Garner stated that she was not familiar with the ADU permitting statutes or the related County ADU ordinance, and that she would get back to Dr. Bly-Chester on September 8, 2022.

weintraub tobin chediak coleman grodin
law corporation

34.    On September 8, 2022, Dr. Bly-Chester told Karen Garner in a phone call that the square footage had been verified by Steve Frizzle of Building Services. Ms. Garner responded that she had referred the issue to the County Counsel's Office. Dr. Bly-Chester asked Ms. Garner whether she had ever asked County Counsel to review any ADU ministerial permit before. Ms. Garner responded by stating that she had not, and that "yours is the only one."

35.    After the phone call, also on September 8, 2022, in an email exchange about Bly-Chester's ADU with Defendant Garner's Executive Assistant, Defendant Kathy Witherow, told Steve Frizzle about the phone conversation between Defendant Garner and Dr. Bly-Chester, stating: "She is claiming you have calculated and determined that her ADU square footage is under our allowed maximum." Steve Frizzle, the Building Reviewer who was, and still is, authorized to review and verify square footage in ministerial permits on behalf of the County wrote: "Kathy........I don't remember talking to her but the ADU is under 1600 sq ft." Kathy Witherow stated, as though it were established policy, of the Planning Division and Building Division, the following:

> Thank you! I was able to talk with Janice and now understand. The issue is the difference with what Building reviews and what Planning reviews. Building/how to build it - Planning what and where you can build. You (Building) do not count the space that could be easily converted to living space in the square footage, and Planning does based on zoning laws. So, this particular applicant is hanging her hat on the fact that Building accepted her square footage. I think I've got it now...Thanks very much! Kathy

Frizzle later wrote an email to Dr. Bly-Chester, which was forwarded to Defendant Garner, attesting to his having followed all of the County Ordinances and State and Federal Building Codes and that he had measured the square footage at 1,587 square feet, under the 1,600 square feet, during the statutory ministerial 60-day review period.

36.    Based on defendant Witherow's misguided conjecture of how Planning and Building might have separately measured square footage, defendant Garner created her own original interpretation of the Zoning ordinance, misstating it, and omitting important language so that instead of actually potentially habitable space being included in the square footage measurement, she contrived to have all hallways, stairwells, attics, basements, storage areas, and equipment rooms qualify as convertible to habitable space *regardless of their dimensions*, which would imply including

2-foot high attics and other uninhabitable spaces. The California Building Code establishes the minimum dimensions of habitable spaces. Defendant Gardner admitted to Planning Commissioner Kris Payne and Dr. Bly-Chester that she did not know the State Building Code and would have to rely on the Building Personnel in order to interpret what is properly potentially habitable space. Furthermore, by County Ordinance, for this new Director's Interpretation to control any ministerial review, it would have had to have been posted on the County website for at least 30 days without protest before it would become accepted practice by the County. The Director's Interpretation would have had to have been accepted practice before the ADU permit application was completed on May 19, 2022 for it to apply to Dr. Bly-Chester's ADU permit review. This interpretation has never been posted for County acceptance and when defendant Witherow sent defendant Garner's erroneous interpretation of the Zoning Ordinance on September 15, 2022, it was already at least 149 days too late to be applied to Dr. Bly-Chester's ministerial permit review.

37.     Dr. Bly-Chester endeavored to persuade Director Garner that the County lacked authority to condition or delay her project, all the while describing that she needed the ADU to meet her disability needs. Director Garner refused to change her position and over the subsequent weeks and months she insisted that the permit was deemed denied, and declared that if Dr. Bly-Chester moved forward with construction, the County would prosecute Dr. Bly-Chester.  Director Garner stated definitively that she would not give Dr. Bly-Chester a building permit.

38.     On October 17, 2022, Dr. Bly-Chester visited the Building Department, wearing a back brace and walking with a cane, to check on the status of her permit. The first three staff people she spoke with stated that the June 10, 2022 letter from Planner Mattes about setback and square footage was the only outstanding item remaining blocking the permit issuance and that the square-footage was already cleared and verified, so it must be a set-back issue that was the hold-up and sent Dr. Bly-Chester to a Planner to go over the setbacks. The Planning staffer also stated that the County file showed that the square footage was verified and cleared. While the Planning staffer was looking into the setback issue, Defendant Planning Manager Aaron Mount approached Dr. Bly-Chester and said, "she is nobody who can help you." Mount then made a number of other statements expressing his personal animosity toward Dr. Bly-Chester based upon public statements she had made in his

weintraub tobin chediak coleman grodin
law corporation

presences in a public forum on matters of public concern. He said that Dr. Bly-Chester could only speak to Director Garner about her ministerial ADU permit. Dr. Bly-Chester felt that his clear intent was to intimidate and humiliate her in a public setting. His behavior was so egregious, that Dr. Bly-Chester, shaken, went directly to file a hand-written complaint against Defendant Mount first with her District 2 County Supervisor, witnessed by a Building Department staffer, and then followed-up with an online complaint to the Human Resources Department of El Dorado County.

39.    On November 23, 2022, defendant Mattes doubled down on his discretionary review outside of the ministerial review process by preparing and posting to eTrakit a letter to Dr. Bly-Chester that was nearly identical to his June 10, 2022, discretionary review planning letter. The November 23, 2022 letter made no acknowledgment of either the Zoning Administrator public hearing findings of the project's compliance with all zoning ordinances, or of the requested supplemental information provided by Dr. Bly-Chester on June 13, 2022, wherein Dr. Bly-Chester had stated that the ADU was being designed to meet her disability needs. This new letter restated the setback exceedance despite the Zoning Administrator's findings and that the ADU exceeded the maximum 1600 ft.$^2$, but again did not provide an alternative measurement or any indication of why Mattes rejected the County's posted Building Division verified square footage of 1587 ft.$^2$

40.    On April 5, 2023, Karen Garner sent an email to all Planning and Building Department staff not to speak with Dr. Bly-Chester about her ministerial permit application, stating "I am the point of contact for this permit." That email was printed out and taped to the bottom of the Planning and Building Department reception desk computer screen. That posting reportedly was the only notice of its kind to be posted about any of the over 13,000 permits submitted that fiscal year to El Dorado County.

41.    On April 24, 2023, Karen Garner told Dr. Bly-Chester that she would not give Dr. Bly-Chester a permit for the ADU. This statement was made at a meeting also attended by Planning Commissioner Kris Payne wherein Dr. Bly-Chester was wearing a back brace, walking with a cane, and the design of the ADU meeting her disability needs was discussed. Ms. Garner admitted that she could not determine the square footage on her own and would have to defer to the Building Department methodology and that she herself had never made any such measurement of an ADU.

weintraub tobin chediak coleman grodin
law corporation

{4358951.DOCX:7}

Ms. Garner stated "We are not giving you a permit." Based on the context of the statement, it was clear that Ms. Garner had decided she would never issue the permit to Plaintiff. The meeting was recorded with the consent of those in attendance.

42. On August 4, 2023, Dr. Bly-Chester, wearing a back brace and walking with a cane, personally submitted, to the El Dorado County Assessor's Office, a Certificate of Disability signed by her primary physician attesting to her disability.

43. On August 18, 2023, Karen Garner sent Dr. Bly-Chester a letter stating that she considered the ADU permit denied. Dr. Bly-Chester then wrote a detailed response to Karen Garner and included the statement again that the proposed ADU was designed to meet her disability needs and that the County's not recognizing the permit, as deemed approved, was causing her harm.

44. During that same month, Dr. Bly-Chester had learned from a trusted source that Defendant Witherow had stated "we" can't give Dr. Bly-Chester a permit because she had spoken out about the County's mishandling of the "Lime Kiln" — a former Superfund site at the abandoned Diamond Lime Kiln Plant ("Lime Kiln Hazardous Waste Site").

45. Refusing to be coerced into abandoning her free speech rights, Plaintiff spoke out on August 15, 2023 by phone and on September 12, 2023 in person (wearing a back brace and walking with a cane), against false testimony made by County Staff that the Diamond Springs Parkway Environmental Impact Report (EIR) had fully addressed the Lime Kiln Hazardous Waste Site. Dr. Bly-Chester stated during a Board of Supervisors meeting that the Board was being misled by its staff, because at no time had the EIR addressed the County spending $5 million cleaning up hazardous waste that the County had not created and had no responsibility to clean up.

46. On September 25, 2023, Dr. Bly-Chester wrote Tom Burnette, the County's Chief Building Officer, stating that the ADU was designed to meet her disability needs, and that in refusing to recognize her permit as approved, Director Garner was singling her out to deprive her of accessible housing.

47. On October 23, 2023, Dr. Bly-Chester, wearing a back brace and walking with a cane, hand-delivered to the County a formal complaint for denial of accessible housing and for failure to perform a mandatory duty.

**weintraub tobin** chediak coleman grodin
law corporation

{4358951.DOCX:7}                              - 13 -
COMPLAINT

48. On October 26, 2023, Karen Garner and Tom Burnette co-signed a letter stating that Dr. Bly-Chester's permit was "denied."

49. On November 2, 2023, Dr. Bly-Chester personally appeared at the County, wearing a back brace and walking with a cane, to obtain a received-stamped copy of the Certificate of Disability signed by her physician that she had filed on August 4, 2023. The copy County staff handed her inexplicably stated "Denied" in bold handwritten red ink.

50. On December 11, 2023, Dr. Bly-Chester received a "right to sue" notice from the U.S. Department of Housing and Urban Development.

WHEREFORE Plaintiff prays for judgment as set forth below.

## FIRST CLAIM OF RELIEF

### (42 U.S.C. § 1983 Equal Protection Clause Violations - Against All Defendants)

51. Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

52. To establish an equal protection claim, a plaintiff must show that a county or its officials, applied the law in an arbitrary or invidiously discriminatory manner, not rationally related to a legitimate interest. In *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the U.S. Supreme Court recognized equal protection claims brought by a "class of one," where the plaintiff alleges that she was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." In that decision, the court explained that the purpose of extending the equal protection clause to a "class of one" plaintiff is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."

53. As alleged herein, the actions of Defendants, and each of them, acting under color of state law, regulations, rules, customs and usage of regulations and authority, and pursuant to a policy of the County, individually, and in violation of 42 U.S.C. § 1983, deprived Dr. Bly-Chester of her rights, privileges, and immunities under the U.S. Constitution, secured by the Due Process Clause of the Fourteenth Amendment.

/ / /

54. Dr. Bly-Chester possessed a liberty interest in receiving equal treatment and a property interest in the ADU permit, which was deemed-approved under California law.

55. Since at least 1990 it has been clearly established law in the Ninth Circuit that government officials may be held liable under Section 1983 for equal protection claims when they arbitrarily and irrationally refuse to grant permits to property owners.

56. Since at least 2000, it has been clearly established law that a plaintiff may state a claim for violation of the Equal Protection Clause based upon a "class of one" where a defendant state actor has (1) intentionally (2) treated the plaintiff differently than other similarly situated property and/or business owners, (3) without a rational basis. Such allegations are sufficient, separate and apart from any subjective motivation or "ill will," to state a claim under traditional equal protection analysis.

57. Dr. Bly-Chester is informed and believes and thereon alleges that defendants, and each of them, have treated Dr. Bly-Chester differently than other similarly situated property owners, without a rational basis.

58. As a direct and proximate result of the foregoing, Dr. Bly-Chester has been damaged by Defendant in an amount according to proof at trial.

59. Defendant's actions as alleged herein were a substantial factor in causing harm to Dr. Bly-Chester.

60. Defendant knew that the wrongful conduct alleged herein created a substantial risk of harm to Dr. Bly-Chester.

61. In performing each of the unlawful acts alleged herein, Defendants and each of them acted with deliberate disregard for the law and outside the course and scope of their authority.

62. The Individual Defendants cannot shield themselves from liability under the doctrine of qualified immunity because the conduct of each of the Individual Defendants, as alleged herein, violated clearly established law at the time of the constitutional deprivation.

63. Dr. Bly-Chester is entitled to attorney's fees under 42 U.S.C. § 1988.

64. Because the Individual Defendants engaged in the unlawful actions alleged herein maliciously, willfully, and knowingly, Plaintiff is also entitled to punitive damages.

WHEREFORE Plaintiff prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

**(42 U.S.C. § 1983 Substantive Due Process Violations - Against All Defendants)**

65.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

66.    As alleged herein, the actions of El Dorado County's officers, acting under color of state law, regulations, rules, customs and usage of regulations and authority, and pursuant to a policy of the County, individually, and in violation of 42 U.S.C. § 1983, deprived Dr. Bly-Chester of her rights, privileges, and immunities under the U.S. Constitution, secured by the Due Process Clause of the Fourteenth Amendment.

67.    The Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution provides for substantive due process, protecting against certain governmental actions.

68.    Defendants, and each of them, arbitrarily, capriciously, irrationally, and yet deliberately exceeded their authority and jurisdiction by failing and refusing to recognize that the ADU permit Dr. Bly-Chester submitted on May 19, 2022 was deemed approved as of July 18, 2022.

69.    As a direct and proximate result of the foregoing, Dr. Bly-Chester has been damaged by Defendants in an amount according to proof at trial.

70.    Defendants' actions, as alleged herein, were a substantial factor in causing harm to Dr. Bly-Chester.

71.    Defendants knew that the wrongful conduct alleged herein created a substantial risk of harm to Dr. Bly-Chester.

72.    In performing each of the unlawful acts alleged herein, Defendants acted with deliberate disregard for the law and outside the course and scope of their authority.

73.    Since at least 1990 it has been clearly established law in the Ninth Circuit that government officials may be held liable under Section 1983 for substantive due process claims when they arbitrarily and irrationally refuse to grant permits to property owners.

74.    The Individual Defendants cannot shield themselves from liability under the doctrine of qualified immunity because the conduct of each of the Individual Defendants, as alleged herein, violated clearly established law at the time of the constitutional deprivation.

75.    Dr. Bly-Chester is entitled to attorney's fees under 42 U.S.C. § 1988.

76.    Because the Individual Defendants engaged in the unlawful actions alleged herein maliciously, willfully, and knowingly, Plaintiff is also entitled to punitive damages.

WHEREFORE Plaintiff prays for judgment as set forth below.

### THIRD CLAIM FOR RELIEF

**(42 U.S.C. § 1983 Retaliation Against Exercise of Free Speech - Against All Defendants)**

77.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

78.    This claim for relief concerns Defendants' retaliation against Dr. Bly-Chester for making public statements critical of El Dorado County, asserting that it had mishandled a former named Superfund site, known as the Diamond Lime Plant, also referred to herein as the Lime Kiln Hazardous Waste Site, and had ignored the threat to human health and the environment that the hazardous waste posed and violated California Environmental Quality Act (CEQA) requirements to reevaluate the Diamond Springs Parkway Project alignment alternatives and impacts in light of the change in project description before going forward.

79.    The Diamond Lime Plant was a lime production plant in El Dorado County with lime kilns and sludge settling ponds that began operation before 1935 and continued until at least 1977. It processed lime from a quarry six (6) miles away that was transported to the processing plant on an overhead cable transport system. The lime was processed in kilns then shipped out on the railway that ran alongside the site. In or around the 1970s, part of the site was remediated under methods used at the time, which consisted of installing a clay "cap" on top of the old sludge ponds containing caustic lime waste.

80.    Forty years later, the physical manifestations of the lime plant were gone, but substantial quantities of lime waste remained under the unmarked clay "cap" that had been installed decades earlier. In the 2008 Geotechnical Report for the Diamond Springs Parkway Corridor, The Youngdahl Group geotechnical engineers identified highly corrosive soils and the profile of the buried sludge ponds within the proposed right-of-way for the Parkway, advising the County to engage

/ / /

weintraub tobin chediak coleman grodin
law corporation

{4358951.DOCX:7}                    - 17 -
COMPLAINT

experts on corrosive soils, which Youngdahl admitted they were not, to advise on the constructability of the Parkway within the selected project area alignment.

81.    In or around March of 2011, that clay cap was breached in unpermitted grading activities associated with development of the Diamond Dorado Shopping Center, being developed in conjunction with the Diamond Springs Parkway on land located in and around the Lime Kiln Hazardous Waste Site.  Part of the area was remediated between 2011 and 2015, at a cost of approximately $1,000,000. The result of this remediation led to the discovery that the lime waste was also located under and around the County Material Recovery Facility (MRF) adjacent to the Diamond Springs Parkway corridor.

82.    In March 2015, the El Dorado County Solid Waste Advisory Committee ("EDSWAC"), received a report during its meeting that the MRF was located over corrosive sludge ponds from the Lime Kiln Hazardous Waste Site and that there had been a release of caustic hazardous waste due to that 2011 illegal grading.  The Director of the County Environmental Management Department, Greg Stanton, who was the staff of the EDSWAC removed all mention of the potential threat to human health and the environment in the conformed minutes of the EDSWAC, despite being requested to reinsert the notice by multiple members of the EDSWAC before they approved the minutes, including Committee member George Turnboo.

83.    George Turnboo investigated the situation and found that there had been reports of dead animals (such as racoons), and people becoming ill, who came in contact with the leachate released from the abandoned Diamond Lime Plant site.

84.    Despite County Department Directors, and County Counsel, telling Turnboo to "back off" and drop the matter, he instead reported the release to the State Office of Emergency Services, which precipitated a meeting at the County offices among state and County officials. Turnboo requested that Dr. Bly-Chester, with her expertise in hazardous waste remediation, attend the meeting with him. The meeting was held on April 8, 2015.

85.    At that April 8, 2015 meeting, the County's Deputy Director of the Environmental Management Department ("EMD") stated, in response to questions from Dr. Bly-Chester, that the County did not have a case file concerning the Lime Kiln Hazardous Waste Site, that it was not

weintraub tobin chediak coleman grodin
law corporation

weintraub **tobin** chediak coleman grodin
law corporation

investigating the site, had not assigned a case officer to it, had no file on the site, and that no County employee was overseeing cleanup of the site. Another County employee stated that EMD did not have a right to investigate the release because it was on private property; that the County could not enter private property under any circumstances, and certainly not without hard data to put into a report. Dr. Bly-Chester challenged that statement on several grounds, but the County employees insisted that they had no right to address the situation. Turnboo responded to this assertion by noting that the County's proposed Diamond Springs Parkway project corridor ran through the Lime Kiln Hazardous Waste Site.  This caused Dr. Bly-Chester to express her opinion that of course EMD had a right and even an obligation to investigate the environmental condition of any parcels being considered for a County right-of-way project and that they must be working on an Environmental Impact Report (EIR) that must have information on the Lime Kiln Hazardous Waste Site. County staff reiterated that they did not have any such information, did not have a file on the Site, and that only when they were acquiring the right-of-way would they even consider initiating any work to investigate hazardous materials from the Lime Kiln Hazardous Waste Site.

86.     Dr. Bly-Chester later learned that those statements by County staff were false. Among other things, Dr. Bly-Chester learned that the Lime Kiln Hazardous Waste Site, with its buried caustic sludge ponds had first been identified in 2008 by The Youngdahl Group in a geotechnical report completed for the Diamond Springs Parkway and included in the initial 2011 EIR for the Parkway. In addition, the Phase I Environmental Assessment performed in 2009 by The Youngdahl Group and also included in the EIR prepared for the Diamond Springs Parkway project identified caustic soils and the potential for hazardous waste within the Diamond Springs Parkway corridor. Dr. Bly-Chester also learned that the clay cap had been breached in 2011 by an illegal grading operation for construction of the Diamond Dorado shopping mall, which would be the primary beneficiary of the Diamond Springs Parkway. The shopping mall was being developed by a company with ties to former El Dorado County Supervisor, Jack Sweeney.

87.     Dr. Bly Chester prepared notes of the April 8, 2015 meeting that contained her opinions that the County had covered up the presence of hazardous materials so that it could fast-track approval of the proposed Diamond Springs Parkway project and the Diamond Dorado shopping

center development. Dr. Bly-Chester then distributed her notes to everyone who had attended the meeting as well as senior staff of the Regional Water Quality Control Board and the State Department of Fish and Wildlife. Those notes eventually were posted on the "Save Our County" website. Dr. Bly-Chester was interviewed about her notes by several reporters, and she was quoted in several articles covering the subject.

88. In January 2016, because she had suffered an injury leading to her disability, Dr. Bly-Chester's firm, Rosewood Environmental Engineering, engaged a California Qualified Stormwater Designer and Practitioner who conducted sampling of surface water directly adjacent to a section of the El Dorado Trail located near the Lime Kiln Hazardous Waste Site.  The pH of the surface water was 13.5. Because pH is measured on a logarithmic scale, pH 13.5 is 100,000 times more caustic than the Regional Water Quality Control Board (RWQCB) Water Quality Goal of pH 8.5.

89. Dr. Bly-Chester was featured in a documentary, released on YouTube in February 2016, entitled "pH 13.5 Documentary, A Chronicle of Hazardous Waste Negligence and Neglect In El Dorado County." The summary of that YouTube documentary stated as follows: "El Dorado County is covering up environmental contamination by paving over hazardous pH 13.5 caustic waste and by bureaucratic maneuver. The Diamond Springs Parkway, being built through this contaminated site, will cost over 42 million dollars, not including the cost of cleaning up the contaminants."

90. Later in 2016, after the County refused to take any action to clean up the hazardous waste, Dr. Bly-Chester contacted the Regional Water Quality Control Board and helped persuade it to become involved. As a result of the Water Board's involvement, Waste Connections (the operator of the County MRF) spent an estimated $4.8 million in an effort to remediate its own property. Water Board investigations regarding the Lime Kiln Hazardous Waste Site continued for years thereafter, and led to information showing that the Phase 1B right-of-way for the proposed Diamond Springs Parkway was underlain with caustic Lime Kiln waste, thus delaying the County's approval of the proposed Diamond Springs Parkway Phase 1B build out.

91. The Supplemental EIR issued in 2016 for Phase 1B of the proposed Diamond Springs Parkway project falsely stated that all the Lime Waste was located outside of the proposed Diamond Springs Parkway right-of-way and that if any indication of Lime Waste was discovered within the

easement, all work on the parkway would be halted to evaluate how to address the issue. The EIR did not state that the County anticipated a $5,000,000 cleanup effort for the Lime Waste. The Supplemental EIR for the Proposed Phase 1B Design Modification Potential Changes in Impacts and Mitigation Requirements as Compared to the Approved Project is quoted as stating:

> Parcels formerly part of the Diamond & Caldor Railway Depot and engine house on APNs 327-300-08, 327-270-03, 327-270-26, 327-270-27, 327-270-46, 327-270-48, and 327-270-49, **and the Diamond Lime Mineral Plant (051-250-46 and 051-250-54) are located outside the vicinity of the proposed Phase 1B design modification."** Page 31-32.

92. On August 15, 2023, the Chair of the Board of Supervisors placed on the Board's consent agenda, a proposal to accept dedication of a road right-of-way for the proposed Diamond Springs Parkway. George Turnboo, by then a County Supervisor, who was aware that this land was part of the Lime Kiln Hazardous Waste Site, removed the item from the consent calendar for public discussion. Dr. Bly-Chester addressed the Board during the public comment period, and expressed her opinion that County staff had misrepresented that the EIR for the Diamond Springs Parkway had fully addressed the issue of hazardous waste cleanup. After more than an hour of public comment and hearing, the item was continued to a September 12, 2023 public meeting.

93. At the September 12, 2023 public meeting of the County Board of Supervisors, Dr. Bly-Chester spoke publicly, in-person, wearing a back brace and walking with a cane, reiterating her concern that the CEQA review was inadequate and expressing that she protested the County assuming responsible party status on the remediation of the Lime Kiln Hazardous Waste Site, explaining that accepting the proposed right-of-way dedication could place the County at risk of having to fund the entire cost for remediating of the hazardous waste site, without any possibility of recouping the costs from the parties actually responsible for the clean-up. Notwithstanding Dr. Bly-Chester's concerns, the Board voted to accept the dedication, and take financial responsibility for remediating the Lime Kiln Hazardous Waste Site at a cost of up to $5,000,000.

94. Based upon specific information she obtained from a trusted source regarding a statement by Defendant Witherow, Dr. Bly-Chester alleges that Defendants Garner and Burnett decided to not recognize the ADU permit as deemed approved in retaliation for Dr. Bly-Chester speaking about the Lime Kiln Hazardous Waste Site during the public hearings, including for

**weintraub tobin** chediak coleman grodin
law corporation

weintraub tobin chediak coleman grodin
law corporation

comments she made on that subject at the August 15, 2023 and September 12, 2023 Board of Supervisor's meetings.

95. During the same period that the Lime Kiln Hazardous Waste Site came to Dr. Bly-Chester's attention, she was hired as an environmental engineering expert by counsel on behalf of Lynn Harrington to conduct environmental assessments and limited soil sampling at property Harrington owned adjacent to the environmental study area of the Diamond Springs Parkway. Dr. Bly-Chester's research uncovered that the 2009 Youngdahl Phase I Environmental Assessment, included in the 2011 Diamond Springs Parkway EIR, identified residual carcinogenic, toxic, and hazardous materials remaining in groundwater from hazardous waste releases directly up-gradient from the Harrington property. The 2009 Youngdahl Phase I report stated that the hazardous releases were a potential environmental threat to the downgradient properties of interest to the County and may interfere with construction of the Diamond Springs Parkway.

96. In 2010, the County constructed a parking lot above the Harrington property and systematically exposed the Harrington property to uncontrolled storm water run-off through a creosote-lined wooden culvert unrated for the runoff load without benefit of the required drainage control plan and in violation of: 1) the required CEQA environmental impact mitigation measures for the project, 2) the Army Corps of Engineers 404 permit, 3) the Water Resources Control Board 401 Certification, and 4) the Sacramento Placerville Transportation Corridor Joint Powers Authority (SPTC-JPA) agreements. The flooding exposed Harrington, who is now suffering from cancer, to carcinogenic and toxic contaminants and toxic molds and undermined the foundation of the house on the property causing the property to be condemned and driving Harrington into bankruptcy. Dr. Bly-Chester was named as an expert witness and filed a declaration in that legal proceeding.

97. According to a declaration by former El Dorado County Supervisor Ron Briggs filed in support of Plaintiff Harrington, El Dorado County engaged in deliberate retaliation against Bly-Chester for speaking out publicly regarding the County's conduct on these issues.

98. In speaking out about the Lime Kiln Hazardous Waste Site and the Harrington Property matter, and El Dorado County's conduct in both cases in relation to fast-tracking the

/ / /

Diamond Springs Parkway Project without regard to human health and environment, Dr. Bly-Chester was speaking as a private citizen, and on matters of public concern.

99. Plaintiff is informed and believes and thereon alleges that Defendants and each of them retaliated against Dr. Bly-Chester based upon Dr. Bly-Chester's public statements regarding the County's mishandling of the Lime Kiln Hazardous Waste Site. In other words, the actions of Defendants, and each of them, were taken in response to Dr. Bly-Chester's exercise of constitutionally protected conduct, to chill or punish Dr. Bly-Chester for exercising her First Amendment rights.

100. Dr. Bly-Chester is informed and believes and thereon alleges that her statements regarding the County's mishandling of the Lime Kiln Hazardous Waste Site and the Harrington Case were substantial motivating reasons for Defendants, and each of them, to refuse to recognize that Dr. Bly-Chester's ADU permit was deemed approved under California law. Dr. Bly-Chester is informed and believes, and thereon alleges, that at least one of the goals of Defendants, and each of them, was to effectively banish Dr. Bly-Chester from El Dorado County by making it impossible for her to live in accessible housing in El Dorado County.

101. As a direct and proximate result of the foregoing, Dr. Bly-Chester has been harmed in an amount according to proof at trial. Defendant's actions injured Dr. Bly-Chester in a way that would chill a person of ordinary firmness from further protected activities.

102. The conduct of Defendants and each of them, was a substantial factor in causing Dr. Bly-Chester harm.

103. Defendants, and each of them, knew that the wrongful conduct alleged herein created a substantial risk of harm to Dr. Bly-Chester.

104. In performing each of the unlawful acts alleged herein, the Individual Defendants, and each of them, acted with deliberate disregard for the law and outside the course and scope of their authority.

105. Since at least 1970, it has been clearly established law that government officials may be held liable under Section 1983 for retaliating against private citizens based upon statements they make as private citizens on matters of public concern, to punish them for exercising their First

Amendment rights. The Individual Defendants thus cannot shield themselves from liability under the doctrine of qualified immunity because the conduct of each of the Individual Defendants, as alleged herein, violated clearly established law at the time of the constitutional deprivation.

106.    Dr. Bly-Chester is entitled to attorney's fees under 42 U.S.C. § 1988.

WHEREFORE Plaintiff prays for judgment as set forth below.

**FOURTH CLAIM FOR RELIEF**

**(42 U.S.C. § 1983 Injunctive Relief – Against the County, Burnett, and Garner)**

107.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

108.    Plaintiff brings this claim against Garner and Burnett in their official capacity for injunctive relief under 42 U.S.C. § 1983.

109.    Defendants and each of them have unlawfully and in violation of Dr. Bly-Chester's constitutional rights, failed and refused to recognize that the ADU permit was deemed-issued under California law, and have further threatened to prosecute Dr. Bly-Chester if she moved forward with construction of the ADU on the Subject Property.

110.    Dr. Bly-Chester is informed and believed and thereon alleges that she cannot obtain complete relief, including to prevent against irreparable harm, in the absence of an injunction issued by this Court.

111.    Dr. Bly-Chester is entitled to attorney's fees under 42 U.S.C. § 1988.

WHEREFORE Plaintiff prays for judgment as set forth below.

**FIFTH CLAIM FOR RELIEF**

**(Declaratory Judgment - 28 U.S.C. § 2201– Against All Defendants)**

112.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

113.    Government Code Section 65852.150, spells out the legislative intent of the ADU law enacted, in part, to provide accessible housing to those with disabilities through a streamlined process to fast-track ADU permitting on a ministerial basis with no discretion by the local government to block or delay qualified projects.

114.    Code Section 65852.150 states that the California Legislature found and declared that, among other things, allowing accessory dwelling units (ADUs) in zones that allow single-family and multifamily uses provides an essential component in addressing California's housing needs. The ADU Law has been revised and updated to be more effective at creating more housing units, including meeting the housing needs of people with disabilities in a streamlined manner that reduces barriers to obtaining such housing.

115.    Under Government Code Section 65852.2 Plaintiff's ADU building permit was deemed approved as of July 18, 2022, with all the rights and privileges of a County approved building permit.

116.    All Planning and Building Department Staff, but especially the Planning Reviewer for the ADU permit in question (Defendant Mattes), the Planning Manager (Defendant Mount), the Building Official for Permitting (Defendant Burnett), and the Director of Planning and Building (Defendant Garner) were at all times under a mandatory ministerial duty to clear the tracking system and ensure the ADU permit was recognized as "approved" as of July 18, 2022.

117.    Defendants, and each of them, have taken the opposing view. Instead of operating under their mandatory ministerial duty, as directed by the California legislature, and applying only "objective standards" in reviewing Dr. Bly-Chester's ADU permit application within the 60-day approval period, Defendants conducted multiple discretionary reviews of Plaintiffs ADU permit application, and applied an arbitrary and capricious (secret, unpublished, and never-before-applied) standard for calculating the square footage of Dr. Bly-Chester's proposed ADU.

118.    A justiciable controversy thus exists between the parties as to whether Plaintiff's ADU permit application was deemed approved as of July 18, 2022.

119.    Fed R. Civ. P. 57 and 28 U.S.C. § 2201 provide this Court with the authority to declare the rights and other legal relations of the Parties with respect to this controversy. As stated in Rule 57, "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. The court may order a speedy hearing of a declaratory-judgment action."

WHEREFORE Plaintiff prays for judgment as set forth below.

/ / /

## SIXTH CLAIM FOR RELIEF

**(42 U.S.C. § 12132 Violation of the Americans with Disabilities Act – Against All Defendants)**

120. Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

121. Dr. Bly-Chester is a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12131 of the Americans with Disabilities Act ("ADA"). Section 12132 of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." To recover under Title II of the ADA (42 USCS §§ 12131 et seq.), Plaintiff must show that she was denied public benefit.

122. At all relevant times herein, Defendants and each of them knew that Dr. Bly-Chester was a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12131 of the Americans with Disabilities Act ("ADA").

123. The implementing regulations of Title II of the ADA provide in pertinent part, as follows:

> A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:
> (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;
> (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or
> (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability.

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the

**weintraub tobin** chediak coleman grodin
law corporation

modifications would fundamentally alter the nature of the service, program, or activity.

A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. §§ 35.130(b)(2),(b)(6),(b)(7)(i),(b)(8).

124.     It is well-established that the ADA applies to zoning decisions.  Numerous courts have ruled that local government entities are required to consider making reasonable accommodations of their policies when faced by zoning requests from disabled individuals or their representatives.

125.     Dr. Bly-Chester was excluded by Defendants from participation in El Dorado County's services, programs, or activities.  Among other things, Defendants and each of them denied Dr. Bly-Chester a public benefit, consisting of the approval of the permit application she submitted to El Dorado County to construct an accessible ADU. Alternatively, Defendants excluded Dr. Bly-Chester from participation in the expedited permitting process for ADUs enacted by the California legislature.

126.     Defendants and each of them disregarded the ministerial permitting approval process specified in the ADU Law and failed to provide Dr. Bly-Chester with a reasonable accommodation, as required under the ADA.  The County, and its Planning and Building Department, refused to permit reasonable modifications to the County's permitting process, and the Planning Department's purported but never demonstrated square footage calculation methodology, to conform it to the Building Department's method of calculating square footage. Dr. Bly-Chester sought the ADU permit so she could build an accessible dwelling unit for her use. Dr. Bly-Chester had a pre-existing disability when she applied for the ADU permit. Defendants knew or should have known of Dr. Bly-Chester's disability when she asked, on multiple occasions, that the Planning Department recognize that her ADU permit was deemed-approved as of July 18, 2022.

127.     In order to afford Dr. Bly-Chester an equal opportunity to use and enjoy an accessible ADU, it was necessary for the Planning Division to accept the same objective square footage calculation as the Building Department, and to recognize that the ADU permit was deemed approved.

It was reasonable to expect that the Planning Division would use the same methodology for calculating the square footage of the ADU as the Building Division, and it should have done so. Defendants, however, refused to permit the modifications to the Planning Division's arbitrary and capricious method for claiming to calculate the square footage, although no alternative calculation was ever done, of dwelling space to the objective standard the Building Division had been using up to and including on July 18, 2022.

128.    Dr. Bly-Chester is informed and believes and thereon alleges that Defendants, and each of them, failed to consider making a reasonable accommodation to Dr. Bly-Chester.

129.    Dr. Bly-Chester is informed and believes and thereon alleges that it would have imposed no undue burden, or any burden at all, on the Planning Division to use the same methodology to calculate the square footage of the dwelling unit as the Building Division, especially because the Planning Division had never used an alternative measurement before Dr. Bly-Chester had applied for an ADU building permit. Nor would that accommodation have fundamentally changed the County's services in reviewing permit applications for ADUs within the meaning of the ADA or the decisional law interpreting it.

130.    Dr. Bly-Chester is informed and believes and thereon alleges that her exclusion or denial of benefits available under the expedited permitting approval process for ADUs was by reason of her disability.

131.    As a direct and proximate result of the foregoing, Dr. Bly-Chester has been damaged by Defendant in an amount according to proof at trial.

132.    The conduct of Defendants, and each of them, was a substantial factor in causing Dr. Bly-Chester's harm.

133.    Dr. Bly-Chester is entitled to attorney's fees under 42 U.S.C. § 12205.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SEVENTH CLAIM FOR RELIEF

**(Violation of California Fair Employment and Housing Act – Against All Defendants)**

134.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

weintraub tobin chediak coleman grodin
law corporation

135.    At all relevant times herein, Dr. Bly-Chester has been a person with "disability" within the meaning of Cal. Gov. Code § 12955.3.

136.    At all relevant times herein, Defendants and each of them knew that Dr. Bly-Chester was a person with a disability within the meaning of Cal. Gov. Code § 12955.3.

137.    Under section 12927 of the California Government Code, Discrimination regarding housing accommodations includes: "the refusal to permit, at the expense of the disabled person, reasonable modifications of existing premises occupied or to be occupied by the disabled person, if the modifications may be necessary to afford the disabled person full enjoyment of the premises…," as well as "refusal to make reasonable accommodations in rules, policies, practices, or services when these accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling."

138.    By failing and refusing to recognize that Dr. Bly-Chester's permit application for her proposed ADU was deemed approved under California law as of July 18, 2022, and threatening to prosecute Dr. Bly-Chester if she proceeded with constructing the ADU, Defendants, and each of them, refused to permit Dr. Bly-Chester to make reasonable modifications to the Subject Property that are necessary to afford Dr. Bly-Chester full enjoyment of the Subject Property.

139.    Additionally, Defendants and each of them refused to make reasonable accommodations in the rules, policies, practices, or services of the County's Planning and Building Department, as necessary to afford Dr. Bly-Chester an equal opportunity to use and enjoy her proposed ADU. The County, and its Planning and Building Department, refused to permit reasonable modifications to the County's permitting process, and the Planning Department's square footage calculation methodology, to conform it to the Building Department's objective method for calculating square footage. Dr. Bly-Chester sought the ADU permit so she could build an accessible dwelling unit for her use. Dr. Bly-Chester had a pre-existing disability when she applied for the ADU permit. Defendants knew or should have known of Dr. Bly-Chester's disability when the Planning Department refused to recognize that her ADU permit was deemed-approved.  In order to afford Dr. Bly-Chester an equal opportunity to use and enjoy an accessible ADU, it was necessary for the Planning Department to accept the same square footage calculation as the Building Department, and

weintraub tobin chediak coleman grodin
law corporation

to recognize that the ADU permit was deemed approved. It was reasonable to expect that the Planning Department would use the same methodology for calculating the square footage of the ADU as the Building Department. The Planning Department at the time had never developed an alternative method of calculating square footage and no actual calculation of square footage was ever conducted by any of the defendants. Defendants refused to permit the modifications to the Planning Department's (never officially established) method for calculating the square footage of dwelling space. In order to reinterpret zoning ordinances, the Planning Director would have had to have posted her interpretation on the County website before May 19, 2022, when the ADU application was deemed accepted by the County as complete. Defendant Karen Garner never did so, and so no alternative "Planning interpretation" of how to measure square footage was in place when Defendants purported to deny Bly-Chester her permit, based on an alternative measurement scheme, that to Dr. Bly-Chester's understanding and belief, based on California Public Records Request responses, has never been applied on any other ADU permit in the County. Defendants ignored the Zoning Administrator's public hearing approval eliminating any further legitimate review by anyone on the Planning side of the Planning and Building Department, including Defendants Mattes, Mount, Witherow, and Garner. Additionally, the defendants, and each of them, disregarded the ministerial permitting approval process, disregarded the statutory 60-day review period to approve the ADU permit, and denied Plaintiff's request for a reasonable accommodation.

140. As a direct and proximate result of the foregoing, Dr. Bly-Chester has been damaged by Defendant in an amount according to proof at trial.

141. The conduct of Defendants, and each of them, was a substantial factor in causing Dr. Bly-Chester's harm.

142. Dr. Bly-Chester exhausted all administrative remedies applicable to this claim for relief by filing a complaint with the U.S. Department of Housing and Urban Development ("HUD") and the California Civil Rights Department, and by receiving a "right-to-sue" notice from HUD and the State of California Civil Rights Division, as alleged herein.

143. Dr. Bly-Chester is eligible for an award of attorney's fees and costs, including expert witness fees, under section 12965(c)(6) of the California Government Code.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**PRAYER**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

FIRST, SECOND, AND THIRD CLAIMS FOR RELIEF (§ 1983 Damages Claims)

1.      For compensatory damages according to proof at trial;

2.      For punitive damages against the Individual Defendants;

3.      For attorneys' fees pursuant to 42 U.S.C. § 1988;

4.      For costs of suit incurred herein; and

5.      For such other and further relief as the Court deems just and proper.

FOURTH CLAIM FOR RELIEF (§ 1983 Injunction)

1.      For an express finding that Plaintiff's application for an ADU permit was deemed-approved on July 18, 2022.

2.      For an injunction directing El Dorado County to refrain from surveilling, inspecting, or otherwise interfering with Plaintiff's construction of the ADU and appurtenant structures or related grading activity, and to cease and desist from taking any enforcement actions relating to such construction activities on the Defendant's property, provided the work is done in conformity with Plaintiff's permit application as proven through a final construction completion report by a California Licensed Professional Engineer and/or a qualified third party inspection company resulting in an a recorded occupancy authorization of the ADU and finalized approved permits for appurtenant structures and grading activities existing at the site as of the date of the submittal of such final report from authorized professional engineers and/or third party inspectors.

3.      For relief from all County fees and assessments related to the ADU building permit;

4.      For attorney's fees under 42 U.S.C. § 1988;

5.      For costs of suit; and

6.      For such other and further relief as the Court deems just and proper.

/ / /

weintraub **tobin** chediak coleman grodin
law corporation

{4358951.DOCX:7}                      - 31 -

FIFTH CLAIM FOR RELIEF (Declaratory Relief)

1. For an express finding and declaration that Plaintiff's application for an ADU permit was deemed-approved on July 18, 2022.

2. For costs of suit; and

3. For such other and further relief as the Court deems just and proper.

SIXTH AND SEVENTH CLAIMS FOR RELIEF (ADA and FEHA Claims)

1. For compensatory damages in an amount according to proof at trial;

2. For costs of suit;

3. For attorney's fees under 42 U.S.C. § 12205 and Cal. Gov't Code § 12965(c)(6); and

4. For such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, SNR demands a trial by jury on all claims and issues so triable.

Dated:  July 29, 2024

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

By:   */s/ David A. Diepenbrock*
Attorneys for Plaintiff
CHERYL BLY-CHESTER

{4358951.DOCX:7}                   - 32 -
COMPLAINT